IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **NIGHT VISION SYSTEMS, LLC** | : | **CIVIL ACTION** |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| **NIGHT VISION DEPOT, INC., et al.** | : | |
| Defendants. | : | **NO. 07-4808** |

**MEMORANDUM AND ORDER**

L. FELIPE RESTREPO                                                                                              SEPT. 2, 2011
UNITED STATES MAGISTRATE JUDGE

On June 29, 2007, Night Vision Systems, LLC ("NVS") filed suit in the Eastern District of Virginia against Night Vision Depot, Inc. ("NVD"), alleging federal copyright infringement violations; the case was transferred to the Eastern District of Pennsylvania on October 26, 2007. On September 17, 2008, NVS filed an Amended Complaint joining Cejay Engineering ("Cejay"). Cejay filed an Answer, with seven counterclaims against NVS, on November 5, 2008. Only three claims remain in this lawsuit: Counts I, II, and III of Cejay's counterclaims alleging false advertising under the federal Lanham Act, as well as tortious interference with contracts and unfair competition under Pennsylvania law. (Summ. J. Hr'g Tr. 2-3, July 28, 2011.) Before the Court is Counterclaim Defendant NVS's Motion for Summary Judgment and Statement of Facts[1] (Doc. 215) (herein cited as "Defs.' Mot." and "Defs.' Facts," respectively), Counterclaim

---

[1] NVS submits its Motion for Summary Judgment on behalf of itself and DRS Technologies, Inc. ("DRS"). (See Defs.' Mot.) Although the counterclaims remaining in this lawsuit are brought by Cejay against NVS only, NVS is a subsidiary of DRS. (Defs.' Mot. 1.) Counterclaim Defendants NVS and DRS are referred to collectively as "NVS" and Counterclaim Plaintiff is referred to as "Cejay" or "Cejay Engineering."

Plaintiff Cejay Engineering's Response thereto (Doc. 218) and Statement of Facts (Doc. 219) (hereinafter cited as "Pl.'s Resp." and "Pl.'s Facts"), and NVS's Reply (Doc. 221). The Court also considered several supplements submitted by the parties (Docs. 223, 224, 227, 231) and oral argument held on July 28, 2011. For the reasons that follow, NVS's motion is denied.[2]

## I.  FACTUAL BACKGROUND

For more than twenty years, Cejay Engineering has designed and manufactured equipment with night vision applications for use by the military and law enforcement agencies. (Pl.'s Resp. 6; Defs.' Mot. 2.) Among Cejay's most popular night vision products are the Phoenix and Phoenix Junior infrared beacons, which are the primary products at issue in this case. These beacons emit a signal that is only visible by individuals using night vision goggles and can be used to minimize incidents of friendly fire in the field. (Pl.'s Resp. 6-7.)

In 1994, one of Cejay's current owners began selling the Phoenix beacon to Night Vision Equipment Company ("NVEC"), a distributor owned by William Grube, Jr. (Defs.' Mot. 2.) During the 1990s, NVEC hired several retired United States military personnel to work with Cejay's ownership to develop and sell Cejay's products through the NVEC catalog and website. (Defs.' Mot. 3.) NVEC sold its assets to DRS in December 2004, forming what eventually became known as Night Vision Systems. (Pl.'s Resp. 7; Defs.' Mot. 4.) Cejay then sold its beacon products to NVS under the same terms as it previously sold beacons to NVEC. (Pl.'s Resp. 7.)

---

[2] Counsel for both parties also submitted letters outlining their respective positions as to whether any of Cejay's claims for injunctive relief remain open in this case, an issue disputed by the parties. (Docs. 234, 235.) The Court has considered both letters and will revisit the issue of injunctive relief at the appropriate time.

NVS emerged as the largest distributor of Cejay's combat identification ("CID") products; in 2004 and 2005, Cejay sold over ninety-five percent of its CID products to NVEC/NVS. (Defs.' Mot. 10; Pl.'s Resp. 2.) Cejay's sales to NVS totaled approximately $1.5 million in 2005, $2.6 million in 2006, and $4 million in 2007. (Defs.' Mot. 10; Defs.' Facts ¶¶ 69-73; Pl.'s Facts ¶¶ 69-73.) During this time, according to NVS, Cejay sold CID products to NVS under a "favored" or "Tier 1" pricing scheme, whereby NVS received a fifteen to twenty percent discount off of the price of the same products sold to other purchasers; this discount allowed NVS to win a number of military supply contracts. (Defs.' Mot. 10.) At no time did Cejay enter in to an exclusive distribution agreement with either NVS or its predecessor NVEC. (Pl.'s Resp. 7-10.)

The United States military purchased Cejay's products through several channels: (1) the Government Services Administration ("GSA") website called "GSA Advantage!"; (2) the Defense Logistics Agency ("DLA") via various government websites that solicited bids for products; and (3) "prime vendor" contracts between the government and select suppliers/distributors. (Defs.' Mot. 5-7; Defs.' Facts ¶¶ 27, 34, 40; Pl.'s Facts ¶¶ 27, 34, 40.) NVS utilized all three of these methods to sell Cejay's CID products, including selling to at least one other distributor that held a "prime vendor" contract. (Defs.' Mot. 5-7.)

By 2007, the business relationship between Cejay and NVS began to deteriorate. In October 2007, NVS attempted to assert ownership over Cejay's Phoenix and Phoenix Junior trademarks. (Pl.'s Resp. 10; Defs.' Mot. 11.) In June 2008, NVS offered to recognize Cejay as the owner of the Phoenix trademarks in exchange for an "exclusive global distribution agreement" with Cejay. (Pl.'s Resp. 4.) Cejay did not enter in to such an agreement. (Pl.'s

Resp. 7-10). NVS thereafter withdrew its trademark applications. (Pl.'s Resp. 5.) By 2009, Cejay had begun working with other distributors for its CID products, and ADS Tactical ("ADS") became the largest distributor of such products. (Defs.' Mot. 12; Defs.' Facts ¶ 87; Pl.'s Facts ¶ 87.)

Cejay contends that throughout the course of its relationship with NVS, NVS made numerous misrepresentations about Cejay products and the relationship between NVS and Cejay. First, Cejay alleges that NVS represented to trade show attendees that it was the exclusive distributor of Cejay products. (Pl.'s Resp. 11-12.) According to Cejay, NVS made such representations in order to ensure that it remained the middleman "in all of Cejay's deals," because "[i]f buyers learned they could go directly to Cejay that would hurt NVS's sales." (Pl.'s Resp. 12.) Cejay also alleges that NVS falsely represented on government websites and in federal bids that it manufactured Cejay's beacons. (Pl.'s Resp. 12-14.)

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). An issue will be considered "genuine" if a reasonable jury could consider that issue and return a verdict for the non-moving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). A factual dispute will be considered "material" if it could impact the outcome of the matter under governing law. Id.

At the summary judgment stage, the moving party bears the initial burden to identify

those portions of the record that demonstrate to the court that there is an absence of genuine issue of material fact.  See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  If the moving party meets this burden, summary judgment is appropriate where the non-moving party fails to make a factual showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Id.  When deciding a motion for summary judgment, the Court must draw all reasonable inferences in the light most favorable to the non-moving party.  Hugh v. Butler County Family YMCA, 418 F.3d 265, 267 (3d Cir. 2005).

### III. LANHAM ACT

In Count I of its Answer and Counterclaims, Cejay brings a claim for false advertising pursuant the Lanham Act ("Act"), 15 U.S.C. § 1125(a)(1)(B).  The Act states, in relevant part:

> (1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which-
>
> . . .
>
> (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,
>
> shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

**A. Standing**

NVS first challenges whether Cejay has prudential standing in order to bring a claim under the Lanham Act.  Prudential standing refers to "a set of judge-made rules forming an

5

integral part of 'judicial self government.'" Conte Bros. Automotive, Inc. v. Quaker State-Slick 50, Inc., 165 F.3d 221, 225 (3d Cir. 1998) (quoting Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992)).  Unlike a constitutional standing inquiry,[3] which asks whether a "case" or "controversy" exists, the prudential standing inquiry is used to determine whether a particular plaintiff is "a proper party to invoke judicial resolution of the dispute and the exercise of the court's remedial powers."  Id. (quoting Bender v. Williamsport Area Sch. Dist., 475 U.S. 534, 546 n.8 (1986)).  "These requirements are designed to 'limit access to the federal courts to those litigants best suited to assert a particular claim.'"  Gen. Instrument Corp. of Del. v. Nu-Tek Elec. & Mfg., Inc., 197 F.3d 83, 87 (3d Cir. 1999) (quoting Phillips Petroleum Co. v. Shutts, 472 U.S. 797, 804 (1985)).

In Conte Brothers, the Third Circuit outlined a five-factor test to be used when determining whether a party has standing under the Lanham Act:

> (1) The nature of the plaintiff's alleged injury: Is the injury of a type that Congress sought to address in providing a private remedy for violations of [the Lanham Act]?
>
> (2) The directness or indirectness of the asserted injury.
>
> (3) The proximity or remoteness of the party to the alleged injurious conduct.
>
> (4) The speculativeness of the damages claim.
>
> (5) The risk of duplicative damages or complexity in apportioning damages.

Conte Bros., 165 F.3d at 233.  Courts applying the Conte Brothers test consider each factor individually, ultimately weighing the factors together without giving any one particular factor

---

[3] In this case, NVS does not challenge the existence of constitutional standing.

determinative weight.  See Joint Stock Society v. UDV North America, Inc., 266 F.3d 164, 180 (3d Cir. 2001).  The Fifth Circuit recently explained the nature and application of the Conte Brothers five-factor test, stating that "[w]hile a multifactor test such as this one inevitably entails some measure of internal redundancy, it is nonetheless a valuable heuristic.  These factors do not pose five wholly distinct inquiries.  Instead, each turn of the prism illuminates a slightly different facet of a single underlying question."  Harold H. Huggins Realty, Inc. v. FNC, Inc., 634 F.3d 787, 797 (5th Cir. 2011).

### (1) Nature of injury

As stated above, the Court must first consider the nature of the plaintiff's alleged injury and whether the injury is "of a type that Congress sought to redress" by providing a private remedy against those who violate the Lanham Act.  The Third Circuit has articulated the focus of the Lanham Act as protecting "commercial interests [that] have been harmed by a competitor's false advertising" and "secur[ing] to the business community the advantages of reputation and good will by preventing their diversion from those who have created them to those who have not."  Conte Bros., 165 F.3d at 234 (emphasis and quotations omitted).  In other words, a plaintiff bringing a false advertising claim pursuant to the Lanham Act must show: (1) a commercial interest; and (2) a competitive harm or injury to its reputation or good will.  Id.; see also Knit With v. Knitting Fever, Inc., No. 08-4221, 2008 WL 5381349, at *12 (E.D. Pa. Dec. 18, 2008).

NVS does not dispute that Cejay had a commercial interest in the sale of its CID products.  (See Defs.' Mot. 18-20; Defs.' Reply 3-7.)  Rather, NVS argues that Cejay has not

suffered a competitive harm, because NVS did not compete with Cejay. According to NVS, its competitors consisted of other distributors that sold Cejay's CID products to the military. (Defs.' Mot. 18.) Cejay counters that the two companies were, in fact, competitors; both Cejay and NVS sold Cejay's CID products to other distributors that would then, in turn, resell those products to the military. Among these distributors was ADS.[4] (Defs.' Mot. 27-29; Hr'g Tr. 17-21, July 28, 2011.)

At oral argument, counsel for NVS presented to the Court a diagram that purported to represent the market for CID products. (Hr'g Tr. 10-11, 7/28/2011.) This diagram showed a simple, linear distribution structure: CID supply companies comprised the first level of the chain; night vision product distributors, including NVS and others, comprised the middle level of the chain; and the government or military sat at the third level as the end-users of night vision products, including Cejay's CID products. (Id. at 10-12.) In other words, suppliers sold to distributors, and distributors sold to the military. During oral argument, counsel for Cejay argued that the diagram oversimplified the somewhat complex purchasing structure for these products.

Both parties acknowledge that in some circumstances, NVS, as a distributor, would resell

---

[4] Significant portions of both NVS's and Cejay's written submissions are devoted to argument as to whether Cejay and NVS competed for sales to end-users, in this case, the United States military. NVS argues that not only did Cejay lack the contract vehicles and personnel to actually compete for military sales, but Cejay also never manifested any intent to do so. Cejay argues at length in its written submissions about NVS's false representations on government purchasing websites as to the manufacturer listed for Cejay CID products. At oral argument, however, counsel for Cejay conceded that although decision-makers at Cejay may have explored the possibility of selling directly to the military, they settled on a market plan that included selling only to distributors who resold their products to the military. (See, e.g., Hr'g Tr. 24-25, 7/28/2011.) In other words, Cejay only competed with NVS for sales to other distributors, such as ADS. Given the representations at oral argument, Cejay's claims of competitive harm are construed at this stage to allege only that Cejay competed with NVS for sales to other distributors, rather than for sales to both other distributors and the military.

Cejay products to other distributors, including ADS, in addition to making sales directly to the military. (See, e.g., Defs.' Mot. 7.) By 2008, Cejay began selling its CID products directly to those same distributors to which NVS was reselling CID products purchased from Cejay. (See J.A. 2238-45; Pl.'s Supp. Answer (Doc. 227), Ex. A.)[5] The market for Cejay's CID products thus cannot accurately be described as a simple distribution "chain." Instead, one distribution channel linked Cejay, NVS, other distributors, and the military; another channel linked Cejay, NVS, and the military; and a third linked Cejay, other distributors, and the military.

As demonstrated by evidence of 2008 purchases, and taking the facts in the light most favorable to Cejay, ADS theoretically *could* have purchased Cejay's CID products either through NVS or from Cejay directly from 2005 to 2008. Thus, when considering some channels within the CID product distribution structure, Cejay stands in a competitive relationship to NVS.[6] By falsely representing that NVS was the sole source of Cejay CID products, NVS ultimately placed Cejay at a disadvantage when other distributors such as ADS sought sources for those products.[7]

---

[5] The parties submitted their respective exhibits to their briefs in a Joint Appendix (herein cited as "J.A.").

[6] In support of its argument that it did not compete with Cejay, NVS cites to the deposition of Derek Haynes, one of Cejay's owners, who did not list NVS when asked what companies competed with Cejay in the CID market. (J.A. 43.) Instead, Mr. Haynes listed four companies that all presumably *manufacture* competitive products. (J.A. 43, Hr'g Tr. 7, 7/28/2011.) And indeed, counsel for NVS proceeded to ask Mr. Haynes questions related to the manufacturing of beacons. (J.A. 43.) For this reason, a reasonable juror could interpret the question posed to Mr. Haynes and the answer given to speak only to those other companies that manufacture CID products, rather than companies who might compete in selling to distributors.

[7] NVS argues that since Cejay benefitted from every NVS sale of Cejay's CID products, there can be no competitive harm in this case. (Defs.' Reply 5-6.) In support of this proposition, NVS cites Knit With v. Knitting Fever, Inc., in which the court denied a plaintiff yarn retailer Lanham Act standing in a suit against a manufacturer. To support its holding, the Court reasoned that plaintiff had failed to allege a competitive harm in part because plaintiff was "selling the precise products which were falsely advertised by [the defendant]." Knit With, 2008 WL

Finding both a commercial interest and a competitive harm, the first factor weighs in favor of standing.[8]

### (2) Directness of injury

Under the second factor, the Court must consider the directness or indirectness of the link between a particular plaintiff's injury and the defendant's conduct at issue. "The issue under this factor is whether the defendants' conduct has had a direct effect on either the plaintiff[] or the market in which [it] participate[s]." Joint Stock Society, 266 F.3d at 181.

NVS contends that any injury suffered by Cejay was of Cejay's own making; NVS maintains that Cejay did not wish to work with a "network of competing distributors." Therefore, NVS argues, Cejay's general assertion that it *could* have made all of the same sales of CID products that NVS made in the same timeframe is an injury too attenuated to support

---

5381349, at *13 n.8. However, this note in Knit With suggests the court's recognition that in stocking the defendant's yarn, for which demand was falsely inflated by defendant's misrepresentations, the plaintiff retailer actually benefitted in some way from defendant's misrepresentations. The Third Circuit had previously recognized this issue in Conte Brothers, holding that there was no competitive harm and noting that if the retailers had simply stocked the defendant manufacturer's falsely advertised product, they would not have suffered any damages. Conte Bros., 165 F.3d at 234-35. In this case, by contrast, the misrepresentations made to other distributors did nothing to increase the demand for Cejay's products. Rather, the evidence suggests those misrepresentations merely ensured that other distributors would purchase CID products through NVS, rather than attempt to approach Cejay directly, in order to fill their existing needs.

[8] Although neither party devoted significant discussion to the particular issue of NVS's representations to other distributors, such as ADS, the Court finds that Cejay has presented evidence from which a reasonable juror could infer that NVS made the misrepresentations to other distributors that Cejay has alleged. (See, e.g., J.A. 2225 ¶ 12; J.A. 851-858.)

prudential standing under the second factor.[9] (See Defs.' Reply 7-8.) Cejay contends that NVS's false statements to customers, indicating that customers could only get Cejay products from NVS, led to a direct injury to Cejay. Specifically, according to Cejay, as a result of NVS's false statements, customers purchased Cejay products from NVS rather than from Cejay. (Pl.'s Resp. 31-32.)

The causal chain between Cejay's injuries and NVS's alleged misrepresentations to other distributors reveals that the harm allegedly suffered by Cejay in this case was fairly direct. This causal chain appears as follows: (1) NVS falsely represented to ADS and other distributors that it was the sole source of Cejay CID products; (2) other distributors believed that they could only purchase Cejay CID products through NVS and as a result, these other distributors purchased Cejay's CID products from NVS and did not purchase directly from Cejay; (3) Cejay lost profits that it could have earned from direct purchases by other distributors. As NVS argues, this may not be a "prototypical Lanham Act case" in that NVS and Cejay both sold Cejay CID products rather than products manufactured by separate suppliers. But ultimately, Cejay's ability to sell its CID products to other distributors, such as ADS, may have been adversely affected by NVS's misleading statements about the potential sources for these products.

The pecuniary harm of lost profits alleged by Cejay is, at the very least, no less direct than that suffered by the plaintiff in Cook Drilling Corp. v. Halco America, Inc., No. 01-2940, 2002 WL 84532 (E.D. Pa. Jan. 22, 2002), where the Court found plaintiff's pecuniary harm to be a "moderately" direct result of the defendants' actions. In Cook Drilling, the plaintiff purchased an

---

[9] While arguing that the harm suffered by Cejay in this case was not direct, counsel for NVS noted that the second factor was a "less material" factor in this case. (Hr'g Tr. 42, 7/28/2011).

air hammer based on the defendant manufacturer's allegedly false representations. Id. at *1-2. After the air hammer broke, the plaintiff claimed financial damages that resulted from the breakage, including repair costs, delay costs, and alternative equipment costs. Id. at *7. The court assessed the causal chain to be that: (1) because of defendant's alleged misrepresentations, plaintiff bought a hammer of inferior quality; (2) defendant's tool broke whereas another brand of hammer would not have; and (3) this breakage resulted in financial losses. Id.

Further, the causal chain in this case is less attenuated than that in a leading Eleventh Circuit case, Phoenix of Broward, Inc. v. McDonald's Corp., 489 F.3d 1156 (11th Cir. 2007). In Phoenix of Broward, a Burger King franchisee brought a Lanham Act false advertising claim against McDonald's, alleging that McDonald's falsely advertised the chances of winning high-value prizes in a promotional game, after these prizes were embezzled by a McDonald's contractor. Id. at 1159-61. The Court outlined the causal chain in that case to consist of the following steps: (1) McDonald's falsely represented to customers the odds of winning one of the rare high-value prizes if customers ate at McDonald's; (2) as a result of this advertising, McDonald's lured customers who would have eaten at Burger King – rather than another fast food restaurant – causing Burger King a loss in sales; (3) but for this misrepresentation, these customers would have eaten at Burger King. Id. at 1169.

Importantly, the Court emphasized, when addressing the third and final step in the causal chain, that the chances of winning a high-end prize would have been remote even absent the embezzlement, and customers still had a fair and equal opportunity to win most other prizes. The Court thus recognized the low likelihood that customers were lured away from Burger King to McDonald's *only* because they sought rare, high-value prizes associated with a promotional

game.  In particular, the Court concluded that "the causal chain linking McDonald's alleged misrepresentations about one aspect of its promotional games to a decrease in *Burger King's* sales is tenuous, to say the least."  Id. (emphasis in original).  Here, by contrast, the misrepresentations alleged correspond directly with the harm alleged; Cejay claims that NVS told distributors they could only get Cejay CID products from NVS and that these distributors then did not make direct purchases from Cejay, which would have resulted in higher profit margins.  Accordingly, the second factor weighs in favor of prudential standing.

### (3) Proximity

Under the third factor, the Court considers the plaintiff's proximity or remoteness to the alleged injurious conduct.  Ultimately, the Court must determine whether there is "an identifiable class of persons . . . whose self-interest would normally motivate them to vindicate the public interest" thereby "diminish[ing] the justification for allowing a more remote party . . . to perform the office of a private attorney general."  Conte Bros., 165 F.3d at 234 (quoting Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters, 459 U.S. 519, 542 (1983)).

NVS argues that other parties – distributors who compete with NVS to sell Cejay CID products – are better suited than Cejay to bring a claim under the Lanham Act, because they are "the only parties with even theoretical claims to injury . . . who lost the opportunity to sell Cejay products."  (Defs.' Reply 8-9.)  Cejay contends that "[t]here is no single party more aggrieved by NVS's conduct of blatantly taking credit and ownership of Cejay's products than Cejay."  (Pl.'s Resp. 33.)

When viewing the market for Cejay's CID products as a linear distribution chain, wherein

NVS sells these products only to the military and Cejay does not possess the capability or interest to compete for such military sales, it is true that other distributors who sell to the military might be more proximate to NVS's alleged false representations. However, in the more complex market that existed, with NVS selling CID products to other distributors that could have and eventually did purchase the same products directly from Cejay, Cejay is sufficiently proximate to counsel in favor of prudential standing. Cejay alleges an injury to its own competitive interests that does not derive from any injury to another party's competitive position. See Huggins Realty, 634 F.3d at 801. The third factor, therefore, also weighs in favor of prudential standing.

### (4) Speculativeness of damages

When assessing damages under the fourth factor, a court should look at those damages that are particular to the plaintiff, such as reduction in sales or loss of profits. Joint Stock Society, 266 F.3d at 184. Further, a court should consider "both the speculativeness of the claimed damages and the avoidability of the claimed damages." Knit With, 2008 WL 5381349, at *16.

In this case, Cejay has put forth some quantifiable evidence of lost profits. Cejay offers the declaration of Mark Haynes, the company's Chief Operating Officer since January 2007. This declaration and the exhibits attached thereto support Cejay's contention that CID products were sold to NVS at lower prices than the same products were sold to other distributors. These damage estimates require some extrapolation, in order to approximate the unit price and quantity of beacons that would have been purchased by other distributors, including ADS, in 2005 through 2008. Yet, while not entirely concrete, these damage calculations are not so speculative,

tenuous, or complex as to clearly undercut standing. Particularly in 2008, toward the end of the damage period in question, Cejay can offer a side-by-side comparison of the unit price and quantity of beacons sold to distributor ADS with the price and quantity of those beacons sold to NVS. (J.A. 2228-45.)

The avoidability of the damages claimed by Cejay also does not clearly undercut standing. Just as the Court noted in Cook Drilling, the lost profits allegedly sustained by Cejay were "less obviously avoidable" than the damages alleged in Conte Brothers. Cook Drilling, 2002 WL 84532, at *9 (citing Conte Bros., 165 F.3d at 235). In Conte Brothers, the Third Circuit noted that the plaintiffs, engine additive retailers, could have simply avoided pecuniary loss by stocking the defendant's product, for which demand was allegedly inflated by the defendant's misrepresentations. Conte Bros., 165 F.3d at 235. In this case, however, to have avoided the injuries Cejay claims to have suffered, Cejay would have needed to: (1) uncover NVS's allegedly false representations about its relationship with Cejay, which "necessarily would have circumvented [NVS's] efforts to disguise the same," Cook Drilling, 2002 WL 84532, at *9; and (2) invest resources in proactively seeking other distributors that may have had an interest in buying directly from Cejay but for NVS's representations.

Cejay's position on damages undoubtedly would have been strengthened by independent expert analysis as to lost sales to other distributors caused by NVS's alleged misrepresentations. However, the evidence submitted by Cejay suggests that this factor at least marginally supports prudential standing.

### (5) Duplicative damages

Finally, under the fifth factor, a court must consider the risk of duplicative damages or the complexity of apportioning damages.  Ultimately, the court uses this factor to assess whether recognizing the right of a particular party in the distribution chain to bring a private damages action will subject the defendant firm to multiple liability for the same conduct and result in complex damages proceedings.  See Conte Bros., 165 F.3d at 235.  "Although stated in the disjunctive, this factor undertakes a unitary inquiry into 'practical concerns of judicial administration.'"  Huggins Realty, 634 F.3d at 803 (quoting Conte Bros., 165 F.3d at 234).

In this case, NVS argues that allowing Cejay to sue would open the door for every entity in the distribution channel to bring suit against NVS for its misrepresentations.  (Defs.' Mot. 23.)  NVS maintains that allowing Cejay to sue would, in turn, allow every one of NVS's customers and direct competitors to bring a Lanham Act claim.  (Defs.' Mot. 24.)  Cejay counters that "only Cejay experienced harm in relationship to every transaction NVS participated in," suggesting that there is no risk of duplicative damages in this case.  (Pl.'s Resp. 36.)

As NVS concedes, there are numerous distributors competing with NVS that, taking Cejay's allegations as true, suffered harm because Cejay was "hidden" from the marketplace as a potential direct supplier to those distributors.  (See Defs.' Reply 13.)  Other distributors, such as ADS, suffered economic harm by having to purchase beacons – needed to fill military contracts – through NVS, which presumably charged a higher price than Cejay would have.  (See id.)  Due to the complexity of the CID product market, expanding Cejay's prudential standing to bring suit against NVS for profits lost may subject NVS to liability to *both* Cejay and other distributors.  Given Cejay's unique position in this market, however, there is little risk that expanding Cejay's

16

prudential standing will result in a "great increase" in litigation in the federal courts. See <u>Pernod Richard USA LLC v. Bacardi U.S.A., Inc.</u>, 505 F. Supp. 2d 245, 254 (D. Del. 2007). This factor, therefore, remains neutral.

### (6) Balance of factors

In sum, the first three factors of the <u>Conte Brothers</u> standing analysis weigh in favor of standing; the fourth factor weighs marginally in favor of standing, and the last factor does not counsel for or against it. The Court finds that Cejay has standing to bring a Lanham Act claim.

### B. Elements Necessary to Establish a Lanham Act Violation for False Advertising

To prevail on a claim for false advertising under the Lanham Act, a plaintiff must prove the following:

> (1) that the defendant has made false or misleading statements as to his own product [or another's]; (2) that there is actual deception or at least a tendency to deceive a substantial portion of the intended audience; (3) that the deception is material in that it is likely to influence purchasing decisions; (4) that the advertised goods traveled in interstate commerce; and (5) that there is a likelihood of injury to the plaintiff in terms of declining sales, loss of good will, etc.

<u>Brunson Communications, Inc. v. Arbitron, Inc.</u>, 239 F. Supp. 2d 550, 575 (E.D. Pa. 2002) (quoting <u>U.S. Healthcare, Inc. v. Blue Cross of Greater Phila.</u>, 898 F.2d 914, 922-23 (3d Cir. 1990)). Although there is no dispute that Cejay's CID products traveled in interstate commerce, satisfying the fourth element of a Lanham Act claim, the parties "hotly" dispute the facts underlying the remaining four elements. (<u>See, e.g.</u>, Pl.'s Resp. 1.) For example, the parties disagree as to whether other distributors, such as ADS, were aware of the potential sources of

17

Cejay's products.  (See, e.g., J.A. 2225 ¶ 12; Defs.' Reply 14-15.)  Finding genuine issues of material facts between the parties as to Cejay's Lanham Act claim, summary judgment is denied. See Anderson, 477 U.S. at 247-48.

### IV.  PENDENT STATE LAW CLAIMS

In addition to its federal Lanham Act claim for false advertising, Cejay brings two claims under Pennsylvania law: unfair competition and tortious interference with contracts.  The parties agree that under Pennsylvania law, the elements necessary to prove unfair competition through false advertising parallel those elements needed to show a Lanham Act violation, absent the requirement for goods to travel in interstate commerce.  See Pa. State Univ. v. Univ. Orthopedics, Ltd., 706 A.2d 863, 870 (Pa. Super. 1998).  (See also Defs.' Mot. 30; Pl.'s Resp. 44-45.)  Finding genuine issues of material facts that preclude a grant of summary judgment as to Cejay's Lanham Act claim, summary judgment must also be denied as to Cejay's claim for unfair competition.

Finally, to show tortious interference with contracts under Pennsylvania law, a plaintiff must show:

> (1) the existence of a contractual or prospective contractual relationship between the plaintiff and a third party; (2) a purpose or intent to harm an existing relationship or to prevent a prospective relationship from accruing; (3) the absence of privilege or justification on part of the defendant; and (4) the occurrence of actual harm or damage to the plaintiff as a result of the defendant's conduct.

Brunson Communications, 239 F. Supp. 2d at 578 (quoting Fresh Made, Inc. v. Lifeway Foods, Inc., No. 01-4254, 2002 WL 31246922, at *12 (E.D. Pa. Aug. 9, 2002)).

Again, the parties contest many material facts underlying the elements of Cejay's claim for tortious interference. Perhaps most notably, the parties contest whether Cejay actually lost any prospective sales or contracts as a result of NVS's practices. (<u>See</u> Defs.' Mot. 31; Pl.'s Resp. 47.) Accordingly, summary judgment is denied as to Cejay's claim for tortious interference with contracts under Pennsylvania law.

## V.  Conclusion

For the foregoing reasons, NVS's motion for summary judgment is denied. An implementing Order follows.